Good morning, Your Honors, and may it please the Court. I'm John Turanian on behalf of Direct Technologies, LLC. I'd like to reserve two minutes for rebuttal. Okay. Keep you on the clock. Thank you. In this case, the District Court correctly held that defendant electronics arts behavior was, quote, legally and morally reprehensible, unquote. We're only here about legally, though. Understood. But the Court erred in two critical ways, on the copyright claim and on the trade secret claim. With respect to the copyright claim, the Court held that Direct Technologies could not be held to be a joint author of the work at issue. And this ruling has left us with a bit of a philosophical or Zen-Cohen-like question, which is, how can a creative work of authorship exist when it's fixed in a tangible medium and exist and yet not have any author at all? The undisputed record shows that this work, which is in my hand, a three-dimensional version of the plumb bob in The Sims game by Electronic Arts, was created by Direct Technologies. So assume they were the author. Yes. Because the District Court made alternative findings, if you will. It did. Correct? Correct. It did. And so would you address, and I think your authorship claim has got some merit to it, but what about the District Court's finding that this, in effect, wasn't copyrightable? You're discussing with respect to whether it meets the threshold in terms of the minimum level of creativity under Feist and ERG. Okay. I'm happy to address that, Your Honor. Specifically, the Court did not fully consider all of the copyrightable elements in the particular work. The original work that was presented to my client was a two-dimensional, 20-sided object. The rendered version here is a three-dimensional, symmetrical object, and it also... You were going to produce a three-dimensional version whatever happened, right? Well, correct, but it also... Because you can't use a two-dimensional version. Correct, but it also is 12-sided as opposed to 20-sided. All the sides are symmetrical and even, unlike the sketch that they were given originally. And most importantly, there is the cutout feature, which means that the object is not just merely a three-dimensional rendering of the plumb bob, but rather has unique cutout features. Now, we're not claiming this is the Mona Lisa. It doesn't have the level of creativity that the Mona Lisa does. But under this Court's precedent, specifically under the North Coast case, and even looking at ERG as well as the Satava case, it meets the minimum threshold for originality. In North Coast, for example, this Court held that an old Mondrian design, which involved a series of vertical and horizontal lines, could give rise to a derivative work, which had its own independent copyright, when a designer simply moved two small vertical lines to the left. That was held to meet the minimum standard of originality. And so, that certainly meets prong one of the ERG or Durham factors. The 20-sided figure comes from the video game? The 20-sided figure comes not from the video game. It comes from the precise sketch that was provided by Electronic Arts to our client, Direct Technologies. And they said, go build this in your version of a three-dimensional being. Okay. Why is that relevant? Because that's what, that's all that our client was given. Our client was given the 20-sided sketch. I understand, but if this is a derivative work, it is a derivative work of the video game, not of the sketch. Well, it could be either. They would have to show that we had access. If it was a derivative work, we surely would have had to have accessed the original video game. What they had access to under the record. You could just buy one and pop it in and watch it on the screen. Well, I don't think the record shows that they did that. The record shows they went on the sketches that were provided to them. Access doesn't mean that you actually did it. Access means it's available. We can infer you did it. Correct. But there's a little secret about what this thing looked like. You could get the video game. I forget, was it on disk or on cartridge? I don't know what. Well, it subsequently came out on USB. I think perhaps at the time it may have been available on a DVD disc. DVD disc. So you look at the DVD disc and look at it. The 20-sided figure wasn't there. I mean, to look at the video game, you don't see a 20-sided figure. Well, two points on that, Your Honor. First is- I mean, that's a yes or no question. It either is or it's not. There's no- Is it based on- If you have two points and you're saying yes or no, so what's the answer to my question? Could you please repeat your question, Your Honor? My question is, does the video game have a 20-sided figure? I don't know if the record establishes whether it has a 20-sided figure or not. The defendant claims that the video game has a 12-sided figure, and I would argue that the record, undisputed record, has a 20-sided figure in two dimensions established as the basis for which my client prepared this three-dimensional work. The second point, which I was going to make, is even if we- Why does that matter, the fact that they were given this piece of paper, it was 20 sides, if the copyrighted work of which this is a derivative is the game? Well, arguably, the 20-sided sketch that they gave them was also a copyrighted work, and so this is a derivative of the 20-sided work sketch that they were given. The sketch they were given was from Electronic Arts. That, because it was fixed in a tangible medium, has its own independent copyright. But they're not claiming that. They're claiming this is the work of the game. Well, with all due respect, I think the claim is- the burden's on us in terms of the claim, and the claim we're making, at least based on the undisputed record, it was based on the 20-sided sketch that was given to my client. They had no knowledge of the underlying game. In fact, the testimony shows that Eric Jones, the owner of the company, had never played the game, and he was the chief person- So if you produced something that was shown in the game, let's assume exactly the way it was shown in the game, what's your position? Our position is if you reproduce something that's exactly from the game, then no, there's not a copyright protection. I agree with that. I would similarly suggest the case law does in fact suggest that if you're merely taking something from two dimensions to three dimensions, that doesn't meet the minimum threshold of creativity. We agree with that. However, this is not merely a two- even if we take Judge Kaczynski's argument that it was based on the 12-sided two-dimensional character in the Sims game. This is not directly a replica of that. It has a specific cutout that involves certain features. That's what I was sort of asking about. Really, your claim to creativity or originality here is breaking the thing open. It's both. Well, but let me just finish. With respect to the questions we've been asking, that goes to the shape of the figure in general, does it not? Correct. You're right. But there's no breaking open the plumb bob in the Sims game, is there? Of course not. No. And so what it looks like when it's broken open is one of the claims you're making to copyright. Absolutely, Your Honor. Why is that so original? Since functionally, you've got to break it open in order to use the USB drive. You can break it open in a number of ways. As our briefing suggests, in fact, there were a number of different sketches. The USB drive could be embedded as a jewel box format inside there. It could have been a split USB where you pull both sides apart and the USB is in the inside. There could have been myriad ways, a slide open mechanism as opposed to a pullout that's actually reversible, which enables you to play the game. Now, I understand there may be functionality concerns, but the reality is this particular design with this particular aesthetic, we're not claiming it's so original. We're claiming it meets the very minimal, trivial threshold, above trivial threshold originality under Feist. Sorry, I didn't mean to speak over you. It's okay. Just so that we're clear, you're making two, not independent, but two sort of claims of copyright. One is that this entire apparatus, this entire plumbob is subject to copyright protection. Correct. But if it's not, then the design of it in a way that produces this half of a plumbob ... Exactly, with this unique cutout design ... ... is copyrightable. That's right, Your Honor, and I see my time is up, so without further, I'll turn it over to my colleague. Okay. Thank you. We'll go to the other side. May it please the court. Good morning, Your Honors. Robert Klieger on behalf of Electronic Arts. On the copyright piece of the case, I think the copyrightability issue is the appropriate place to focus first, and frankly, I think it's clearly dispositive of the case. There was in the record a copy of the copyright application with the specimen that clearly shows it's a 12-sided figure. We have declarations from individuals at Electronic Arts that testify that from the inception, going back many years, the plumbob always has been a 12-sided figure. There was ... Let's assume all that. They designed something that's kind of strange. It has to have a USB in it, and they tried to design it in an artistic way so that when you opened it and got that USB to use, it looked different and looked attractive, and as I see, as your opponent says, it's not the Mona Lisa. But why isn't that enough to get the copyright protection? Because under ERG, even if you assume that there is something artistic about the way the USB drive lifts out of the top of the plumbob, the focus can only be on artistic aspects that can be identified separately from and are capable of existing independently from the utilitarian purpose. The only reason ... But as I understand it, the USB could have stuck out in any number of ways, right? But it's not a question under ERG, the fact that there could have been different artistic approaches to accomplishing something if the only reason it's there is because you need a USB drive to lift out of it. In some way or another, it can lift out here, it actually couldn't lift out the other way because it's not ... The USB drive is larger, but it's tied up with the utilitarian purpose of it. The only reason for being is for the utilitarian purpose. It needs to fit in, it needs to have a locking mechanism so it holds in there. It's all tied up, everything about the cutout, not disputing that there's alternative cutouts that could have been employed, but everything about the cutout is tied up with utilitarian purpose. Moreover, we believe that's enough to dispose of the issue right there, but moreover, when we do talk about the alternatives that were available, the testimony of the CEO, designer of the device at Direct Technology, testified that there actually weren't myriad other ways to do it. He acknowledged that if, for example, you have it where it flips out of the device, you're going to have something that you can't put into a laptop computer because this is going to be in the way of being on the surface of the desk, the protrusion of the plumb bob. Likewise, if you do it with something that would hook into the back of a computer, if you have something that's sticking out lengthwise, you're not going to be able to put this in the back of a computer. If you couldn't, as you can just see by visualizing it, you can't have it come out anywhere other than the top of the device if you're going to have a removable drive because that's the only place it fits. So everything about this, essentially what Direct Technology did is it took two halves, and this is glued together so I probably could pry it apart but I'm not going to, but they took two halves of the existing plumb bob design, put a space in the middle to drop a USB drive in, and designed a manufacturing plan so that you would have two halves stuck together and a USB drive inserting the only place a USB drive logically could insert in a laptop computer, have it be usable with a desktop computer. So this isn't a case where there actually were myriad functional designs, but frankly whether there were other functional designs that would have worked or not, that claimed artistic element is so tied up with the functional element of it. There's no other reason for it to be, and it has to fit the functional aspects of making it so it can be removed, so it locks in, so that it doesn't make a device that's incapable of being effectively used, that it's disregarded for purposes of ERG. Counsel Sedgegold, if I could ask you, could you address trade secret issues on the appeal? Absolutely. So the trade secret issues, the district court we believe appropriately disposed of them given that the first and indispensable element of a trade secret claim is that there actually have been steps, some steps taken, adequate steps, but at minimum some steps taken to protect the secrecy of the alleged trade secret. The alleged trade secret in this case is embodied within the prototype device. This is a final device, but it's embodied within the prototype devices that were provided. It has nothing to do with CAD drawings, materials on computers. It's by receiving a copy of the prototype, DT's allegation is the trade secret was embodied in this. What is the trade secret? One, it has 12 sides instead of 20. I think we can pretty quickly dispose of that. The game, the advertising for the game, the copyright registration, it all has a 12 sided object. Whether or not one drawing was provided that could have been construed to have 20 sides rather than 12 really is beside the point of what this is a derivative work of. So then all you're left with is, was there something about this cut out in the way that the USB drive fits into the device that is a trade secret? The first thing that direct technologies would have to prove in order to be able to make a trade secret claim is that when they sent these prototype drives out, when they made them available to Lithuania, when they made them available to Electronic Arts, when they were made available to the people that direct technologies knew Electronic Arts was providing them to, even though it had no idea who those people were, did it take adequate steps to even communicate, did it believe the prototype devices were trade secrets, were to be treated as confidential? What we have in this case is Lithuania and Electronic Arts purchased, and I want to refer the court, because I think this is a fundamental document for the trade secret claim, to the invoice, the actual invoice, where Lithuania purchased and ultimately EA received from Lithuania five prototype devices, paid $2,050 for them, it's an invoice, it's essentially a purchase order, it has terms on it with respect to pricing, it has absolutely nothing to indicate that the prototypes that they purchased were to be held, treated as confidential, that there was anything secret about it, there were any limitations on what Lithuania or Electronic Arts could do with the prototype devices once they received them. They were purchasing these prototypes and they could do with them what they wanted. Is there an implied understanding that the prototypes that Direct Technology sent are going to be kept in the family, that is not disclosed beyond Electronic Arts and Lithuania? Well, so, as a factual matter, no, there wasn't that understanding. In fact, what we have from the testimony of Direct Technology's own witnesses is that Direct Technology is expected that without a non-disclosure agreement in place, Lithuania would take this device and send it off to manufacturers in China to try to get better pricing, which is exactly what happened. What Direct Technology's witnesses testified is they didn't think that Lithuania would be able to get a lower price. They thought they were protected because they thought they had the best price. They knew, Direct Technology's witnesses testified, that they knew Electronic Arts was going out to distributors, going out to, just to get advice from people, focus groups potentially, on what they thought about this device, whether this is something people would want to purchase. And that they never requested that there be any confidentiality restrictions, that there be any limits on who this prototype could be provided to or what could be done on it. They say they never told Lithuania, they never told Electronic Arts. They literally, the testimony is they never told anybody that they regarded anything about the prototype as being a secret, as being confidential. They never marked them as confidential. They never marked the packaging in which they were sent as confidential. They literally did nothing to communicate that it was confidential. Now, I understand I think we got your answer. So do you concede that the District Court's ruling as to authorship is wrong? No, we do not. The notion that there has to be an author, that Direct Technology's themselves pled this as a joint authorship case. I understand now they want to say Electronic Arts wasn't an author at all. Electronic Arts was an author. They provided a lot of input. Their testimony is Electronic Arts provided a lot of input. Ultimately, though, the question then is, is it a joint author or is Electronic Arts the sole author? And we believe Electronic Arts is the sole author under the three factors that this Court applies in that Electronic Arts had supervision and control. So is that what the District Court held? That Electronic Arts was the author? Yes. To the extent it's copyrightable, yes. And you think it's right that they were not, that Planet of Fear Direct is not the co-author, at least the co-author? To the extent what has been claimed to be copyrightable is copyrightable, we do not believe that they're the co-author because everything was provided to Electronic Arts for its direction, for its feedback. At the very least, they took it from two dimensions to three dimensions. Well, absolutely, but there's plenty of cases that recognize that the work that is done, I mean, and nobody's disputing that it takes work to change it from two dimensions into three dimensions, but the work, the fact that there is labor put into that does not make one a co-author. But you didn't provide them with the mechanisms for opening it or the shape of the thing once opened, did you? Well, the testimony, the testimony of the Lithuania witness, which is not contradicted in the record, was that she is the one, Gina Long, the head of Lithuania, she is the one that directed them to have the USB drive lift out of the top center of the plumbum. Well, but that's not the question I meant to ask, maybe it's the one I did ask. There's a shape remaining after the, when you stick the USB drive into the computer. They claim that's copyrightable, you claim it's not, but let's assume that it is because now we're talking about authorship. They surely authored that shape, didn't they? Well, no, because it's the no other shape, if you remove it. No, no, you're making a copyright argument. I'm saying if we, if we find that that shape is copyrightable, they're the ones who designed it, were they not? Well, they're the ones who came up with options from which Electronic Arts selected that. Okay. Thank you. I'm not sure I understand your answer. If they came up with options and Electronic Arts selected No, in the same, I think in the same way that when you have a motion picture and the director of the motion picture can be, and motion pictures granted are a much more complicated area, but even though the director is not the person that actually films the shot, they're not the choreographer, they're not the person who's actually doing the acting, et cetera, if they're the ones directing, if they're making the decisions, if ultimately people are proposing things to them, but they decide how the product is going to look, they can absolutely be the, be the author under the, under the Ninth Circuit test, even though there's no question that there were other creative contributions made. No, no, the question is not whether they're the author, the question is whether the person that created the artist is not also the author. The, the, the, the, the editor, the, the, who, you know, the film editor may have in fact be a choreographer, but why isn't, why isn't the director a choreographer as well? Well, I think that then gets to the issue of whether you're talking about the individual pieces of the work or the full unitary work, and we would submit that in this case, yes, it is something that can be separated and that the USB drive comes out, but the, the device with the USB drive removed is not a separate work. Well, that's what I was asking you to assume that. If, if we make that assumption, weren't they the co-author of that separate piece? If, if the, if the drive, if the USB with it removed is a separate piece, then I, I, I believe at a minimum there could be a trial as to whether they're a co-author of this piece, of the remaining piece. Okay, thank you. Thank you, Your Honors. We've got about a minute and a half left. Thank you, Your Honors. A few quick points on the copyright and then just addressing the trade secret issue briefly. Regarding functionality, there is nothing functional about this particular cutout. I mean, yes, you can have the USB in a variety of different ways, but there is nothing that has this particular cutout, and again, the case law suggests the minimal level of creativity here was sufficient. It's also worth noting that EA has their own copyright on the two-dimensional plumbob, which is nothing more than hexagonal bipyramid. If that meets the level of threshold of creativity for a copyright, then surely this does as well. With respect to the Al Muhammad test and superintendents and all that of, of the copyright, the reality is EA, if they wanted the ownership for this copyright work, they have a very easy way to effectuate that. They didn't. They can either get a transfer that's enforceable and made valid for consideration and not fraudulent. They didn't do that. Or they can... We don't know whether it's fraudulent or not. That was said... That's an issue of fact. That's an issue of fact. Correct. Correct. Or they could have executed a work made for hire agreement. They didn't. They didn't specially commission this, and DT is not their employee. The Copyright Act then says that the author is the person who fixes in a changeable medium, and this goes back all the way to the Burroughs-Giles case from the Supreme Court, where the court made clear that it's the photographer, the person who gives affectation to an idea that gets the photog... that gets the copyright, not someone who might be his client barking instructions from the back room saying, no, no, no, have that person stand a little bit closer or not. The photographer gets the copyright, and just so, DT gets the copyright here as well and is a minimum a joint author. Finally, with respect to the trade secrets issues in terms of reasonable steps, the court... DT made many reasonable steps. They had explicit vendor agreements that had confidentiality provisions, both written and oral. They protected their works by password. They also had files encrypted, and most importantly, there was an executed confidentiality agreement with EA, which we admit occurred after the misappropriation, but in that confidentiality agreement, EA basically stated that everything related to this design is effectively confidential and treated as intellectual property. Moreover, our client did propose an NDA, which expressly said that all commerce related to this transaction is protected as a trade secret. Admittedly, it was not signed, but the only threshold question here is, were there reasonable steps such that this should go to a jury? And the case law is very clear from Rockwell down that only in extreme cases do you take this out of the hands of a jury. Usually you leave it up to the court... the jury to decide whether reasonable steps were taken. Okay, thank you. Thank you. The case has now been submitted.
judges: Kozinski, Gould, Hurwitz